UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMANDA TOOLE,

           Plaintiff,

                                      Case No.: 21-11850

v.                                   Honorable Gershwin A. Drain

LAKESHORE EAR, NOSE, AND
THROAT CENTER, P.C.,

           Defendant.

_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [#56], DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#55], GRANTING MOTIONS TO SEAL [#60, #74], GRANTING JOINT MOTION TO STRIKE [#64] AND AMENDING SCHEDULING ORDER DATES

## I.    INTRODUCTION

Plaintiff Amanda Toole is an African American woman and acclaimed head and neck surgeon.  She worked for Defendant Lakeshore Ear, Nose, and Throat Center, P.C. (LENT) from 2001 through 2020. Dr. Toole brings this lawsuit asserting she was paid less than her Caucasian male physician counterparts based on her race and gender.  She asserts sex discrimination under Title VII, 42 U.S.C. § 2000e-2 (Title VII)(Count I), violation of the Equal Pay Act, 29 U.S.C. § 206(d)(EPA)(Count II), race discrimination under 42 U.S.C. § 1981(Count III), as

well as sex and race discrimination under Michigan's Elliott-Larsen Civil Rights Act, MICH. COMP. LAWS § 37.2202 (ELCRA)(Count IV).

Now before the Court is the Plaintiff's Motion for Partial Summary Judgment and the Defendant's Motion for Summary Judgment. Also, before the Court are two Motions to Seal, filed by Defendant. These matters are fully briefed and a hearing was held on May 30, 2023. The parties have also jointly moved to strike Plaintiff's exhibit. This motion will be granted. For the reasons that follow, the Court grants Plaintiff's Motion for Partial Summary Judgment, denies Defendant's Motion for Summary Judgment and grants Defendant's Motions to Seal.

## II.    FACTUAL BACKGROUND

LENT is a metropolitan-Detroit otolaryngology center and provides ear, nose, and throat medical care. LENT has surgical specialties with respect to skin, head, neck, sinus, and facial plastic surgery. Dr. Toole is a board-certified otolaryngologist and head and neck surgeon. LENT has seventeen physicians and thirteen of them, including the Plaintiff, were owners/shareholders during the relevant time period.

Each shareholder purchased and owned the same equity interest in LENT— 480 shares, except for its founder, Dr. Megler, who owned 600 shares. On October 1, 2004, Plaintiff became a LENT shareholder when she purchased 480 shares of

LENT for $110,000.00.  Each shareholder served on LENT's board of directors and has a right to vote his or her shares.  Plaintiff and the other board members voted to amend LENT's bylaws to create a two-person Executive Committee to manage LENT's business affairs and determine shareholder compensation.  The Executive Committee was comprised of LENT's President, Dr. Megler, and LENT's Vice President elected to 2-year terms.

At certain times during her employment at LENT, Plaintiff signed debt instruments for LENT, although she did not always consent to doing so.  Plaintiff's written consent was required for LENT to sell, lease or exchange all or substantially all of its assets, merge or consolidate with another business or entity, or dissolve, or liquidate its business.

All shareholders entered into an Employment Agreement with LENT.  By signing the Employment Agreement, Dr. Toole agreed that her duties will be performed "to the reasonable satisfaction of the Company" and that she could not be employed in any other business activity without the prior written consent of the Company.  ECF No. 55, PageID.1317.  Dr. Toole also agreed that treatment and diagnosis of patients will be "in compliance with all applicable State and Federal laws, professional medical standards and all rules and regulations promulgated by the Company." *Id.,* PageID.1318.  Dr. Toole also agreed that "the Company may at any time relieve the Employee from treating any patient of the Company." *Id*.

Dr. Toole "expressly understood that the Company shall have the sole and absolute authority to determine which employee of the Company shall perform professional services for any particular patient of the Company." *Id*. The Agreement entitled Dr. Toole and the other shareholders to health insurance, medical malpractice insurance, reimbursement for medical education, and vacation benefits up to five weeks per year. *Id*.

While Plaintiff had the option to terminate her employment with the Company, she could so with 180 days written notice. *Id*., PageID.1320. If Dr. Toole chose to end the employment relationship, "the Company, in its sole and absolute discretion, shall have the option to pay the compensation due Employee during the applicable notice period and require that during the applicable notice period Employee discontinue providing services for the Company, or otherwise modify Employee's work schedule." *Id*. The Employment Agreement permitted Plaintiff's termination only for "cause" and "notice of such termination."

Dr. Toole also agreed to be bound by a restrictive covenant, which upon her separation from LENT, precluded her from applying for or maintaining medical staff privileges at any hospital located within a 15-mile radius of any of the Company's offices." *Id*., PageID.1321. Moreover, Dr. Toole agreed to disclose and assign to the Company all right, title and interest in and to all ideas, inventions, and improvements made or conceived by the Employee with respect to the practice

of medicine while employed by the Company, together with all patents or copyrights therefor, and to execute all documents requested by the Company in connection therewith." *Id.*, PageID.1322.

LENT asserts that Dr. Toole was not supervised by anyone, and she could set her own schedule and determine which surgeries to perform. However, LENT's President testified that he "kept very close observation of the quality of [Dr. Toole's] work" and LENT's Vice President admitted that LENT "constantly" evaluated the doctors.

In 2011, LENT entered into a Professional Services Agreement (PSA) in which it promised its doctors would work exclusively for the St. John/Ascension hospital system. LENT had two primary streams of revenue: (1) the PSA with Ascension Hospital under which the Hospital paid LENT to treat its patients and (b) services LENT provided directly to its own patients at its offices, which included cosmetic surgeries and hearing related services. The PSA guaranteed that LENT would be paid, without consideration of whether Ascension collected full reimbursement from insurance and patients for LENT's services.

The Hospital paid LENT for medical services it performed based on a dollar amount per service known as the "Conversion Factor." The Hospital and LENT negotiated the amount of the Conversion Factor annually. The Hospital billed health insurance carriers, Medicare/Medicaid and patients. The Hospital paid

LENT by multiplying the Conversion Factor by the standard valuation Medicare assigns to medical services covered by Medicare–known as Relative Value Units (RVU).  However, Medicare does not assign RVUs to procedures it does not cover such as cosmetic procedures, like facelifts and nose jobs.  These procedures resulted in payments to LENT and counted towards the budget.  LENT directly billed its patients for services that did not have RVUs.

According to Defendant, shareholders' compensation was based on each shareholder's percent of total Payments (collections) to the Hospital and LENT from insurance, Medicare/Medicaid and patients.  LENT argues the Executive Committee determined shareholder compensation almost exclusively using an objective mathematical calculation – each shareholder's percentage of total fiscal year Payments to the Hospital and LENT from insurance companies, Medicare/Medicaid and patients multiplied by LENT's profits.  LENT's profits are the total revenue minus expenses and operating reserves.   Each shareholder's fiscal year payments were divided by all payments to the Hospital and Lent to determine each shareholder's percent of total payments.  Each shareholder's percent of all payments was multiplied by LENT's profits to determine share of profits.

LENT further asserts that after determining each shareholder's percent of all payments, the Executive Committee then made minor increases or decreases

(between 1% and 5%) to each shareholder's pay to ensure each shareholder was fairly compensated.  Adjustments were made for shareholders who saw a higher number of pediatric or Medicaid patients with lower reimbursement rates.

Plaintiff counters that LENT relied on the shareholder's RVUs to determine salary.  According to Dr. Toole, LENT minutely documented every RVU, constantly reported on them, and tied physician pay to them in many oral and written statements.  For instance, on November 4, 2015, the shareholder-physicians were informed by LENT that "you are paid based on wRVU's which has protected you from the Medicaid book of business.  You are getting paid on patients seen and the workload of that patient (wRVU).  This will continue."  ECF 70, PageID.3169.

Dr. Toole maintains she billed more than every single one of her colleagues between 2017 and 2020, meaning she had the highest RVUs then her white male physician-shareholder counterparts. She testified that she "was the highest earner every year" and "brought in the most money" to LENT. *See* ECF No.68, PageID.3024.  In support of her contention, Dr. Toole relies on Dr. Megler's admissions during his deposition that Dr. Toole had the most RVUs, and that "her activities brought in the most income from Ascension.  Plaintiff also relies on Charts 5-11, which are attached to her Response brief.  Dr. Toole argues these charts show that in 2017, Dr. Toole was LENT's #1 biller, and she tallied 43%

more RVUs than the men averaged.  For instance, charts 14, 16 and 18 examine

"collections/payments" and they show that men who did worse on that metric still

earned more than Dr. Toole did.  Dr. Toole's rate of pay was lower than everyone

but the brand-new white male hire, even though Dr. Toole had devoted 16 years to

LENT by then.  She asserts this atrocious pattern continued and by her last year at

LENT, everyone earned more, including an even newer treating physician.

Plaintiff maintains LENT is not being honest about how it sets pay.

Dr. Toole also relies on Dr. Rubin's testimony, as well as LENT's

Controller's email correspondence to Dr. Toole, admitting LENT calculates salary

based on both RVUs and Collections/Payments.  Dr. Toole also points to witness

statements admitting that payments for Dr. Fishman were inflated in order to

account for his care for the Medicaid population.  Plaintiff also testified that she

was repeatedly told her salary was based on RVUs.

Plaintiff further testified that when she asked Dr. Megler for financial

information showing pay, he told her that, "we're not making [pay decisions]

transparent."  He explained that he refused to disclose every physician

shareholder's salary to avoid "conflict."  Later, when Dr. Toole and some other

physicians continued to ask for financial data, the Executive Committee decided

unilaterally to loosen access to financial data, however, even with this new policy,

Dr. Toole still did not receive accurate information concerning physician

shareholder pay.  For example, she was told that Dr. Megler was being paid $300,000, when in reality, LENT was paying him an additional $200,000.

At her deposition, Dr. Toole testified that "everything I did seemed to be kind of lessened and everything everybody else did seemed to be so much more important."  *Id*., PageID.3031.  She testified that she was well liked by the residents, who chose to do their residencies at LENT based on her reputation.  Dr. Toole's time and work performing consultations and bringing business to LENT was also ignored. She further testified that the shareholder meeting notes reflect that "Dr. Scapini and Dr. Megler said this[,]" while she is referred to by first name in the meeting notes, "Amanda says this."  *Id*.  "The only other people that were – spoken to by their first name were the nonphysicians who had been invited to give a presentation . . . ."  *Id.*

Dr. Toole also testified about difference in treatment about leave.  Even though Dr. Megler and Dr. Rubin took long vacations, she was penalized for taking time off when her mother was dying of a terminal illness.  *Id.,* PageID.3032.  When she requested the time off, Dr. Megler "was irritated and asked if I felt that that was necessary to take that time off . . . ."  *Id.* When she returned from leave, days and days would go by without seeing patients and Dr. Megler told her that patients did not want to see her anymore because she had taken time off.  She was also removed from the tumor board when she returned from her bereavement

leave. *Id*. Dr. Megler informed her that the reason her pay rate was low was because she took time off. She further claims Dr. Megler continued to chastise her for taking time off year after year. *Id.*

On November 20, 2020, Dr. Toole resigned from LENT. She filed this action on August 10, 2021. On May 20, 2022, Dr. Toole sold her ownership interest back to LENT for $65,760.00.

## III.   LAW & ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall be granted if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr*., 155 F.3d 775, 779 (6th Cir. 1998) (quotations omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### B. Plaintiff's Motion for Summary Judgment

Plaintiff moves for partial summary judgment seeking a ruling that she was an "employee" entitled to protection under the civil rights statutes upon which she sues.[1]

### 1. The EPA

In Count II of her complaint, Dr. Toole brings claims of failure to pay her an equal rate compared to males, under the Equal Pay Act, 29 U.S.C. § 206(d). This Act borrows its definitions from the Fair Labor Standards Act (FLSA). *See* 29 C.F.R. § 1620.8. A protected "employee" is "any individual employed by an employer," while an "employer" is "any person acting directly or indirectly in the interest of an employer." 29 U.S.C. § 203(e)(1), (d) (emphasis added). Due to the circular terms, the word "employ" is the most useful definition in the Act, and it is extremely broad: it is, "to suffer or permit to work." *Id*. § 203(g)

Plaintiff maintains the economic realties test governs whether Dr. Toole is an employee under the EPA. There is support for this contention. *See Russell v. Belmont College*, 554 F. Supp. 667 (M.D. Tenn. 1982). The *Russell* court held that "[t]he intent of Congress when it enacted the EPA as reflected in the legislative

---

[1] Count IV, violation of 42 U.S.C. § 1981, is not at issue in Plaintiff's Motion for Partial Summary Judgment.

history demonstrates that application of FLSA principles when interpreting the EPA is appropriate." *Id*. at 672. "The terms 'employer' and 'employee' must be interpreted broadly and expansively to accomplish the remedial purposes of the FLSA and its amendment of the Equal Pay Act." *Id*. at 675. "The Supreme Court has applied an economic reality test to determine whether an employer-employee relationship exists, emphasizing a person's economic dependence on his employer, when assessing the total relationship of the parties." *Id.* (internal citations omitted). The touchstone of the economic realities test is whether the plaintiff is "dependent upon the business to which they render service." *Donavan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984). Factors the courts consider include—

1) the permanency of the relationship between the parties;
2) the degree of skill required for the rendering of the services;
3) the worker's investment in equipment or materials for the task;
4) the worker's opportunity for profit or loss, depending upon his skill;...
5) the degree of the alleged employer's right to control the manner in which the work is performed; and …
6) whether the service rendered is an integral part of the alleged employer's business.

*Keller v. Miri Microsystems LLC,* 781 F.3d 799, 807 (6th Cir. 2015). Other factors are what the business calls the worker, whether it retained authority to fire the plaintiff, and whether the defendant-company maintains the plaintiff's employment records. *Id*. No one factor is determinative. *Id*.

Plaintiff argues the parties intended that Dr. Toole was an employee of LENT pursuant to an Employment Agreement.  Moreover, courts have found that the "greater [the] exclusivity of th[e] [employment] relationship, the more likely the plaintiff is an 'employee' falling within the scope of the FLSA." *Swinney v. AMcomm Telecommunications, Inc*., 30 F. Supp. 3d 629, 633 (E.D. Mich. 2014).

In this case, Dr. Toole's entire income was derived from LENT.  Indeed, the parties' employment agreement precluded Dr. Toole from working anywhere else without prior written consent of LENT.  Moreover, Dr. Toole was subject to a non-compete clause, which "in and of itself weighs in favor of viewing Plaintiffs as employees." *Id*. at 634. Additionally, Dr. Toole worked solely for LENT for 20 years.  This factor strongly reflects an employment relationship.  *Id*. at 633 (work for 16 months or more reflected employee status); *Costa v. Off Duty Police Servs*., *Inc*., 915 F.3d 1050, 1057 (6th Cir. 2019) (work over a period of years showed employee status); *Hobbs v. Petroplex Pipe & Constr., Inc*., 946 F.3d 824, 835 (5th Cir. 2020) ("employee" status where plaintiff worked for "almost" three years). Dr. Toole performed extremely complex head and neck surgeries using specialized equipment.   LENT had the authority to terminate Dr. Toole's employment.

"The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Keller*, 781 F.3d at 815. LENT is a doctor's office. The "vast" majority of its income came

from the RVUs billed as to each doctor's work.  Hence, delivering medical care to patients was LENT's core mission and business, which Dr. Toole did.  In fact, Dr. Rubin indicated that even though Dr. Toole gave LENT six months of notice before she quit, it was very difficult to replace her, and such a "sudden" departure exposed LENT to the "risk of losing market share." *Id.* at 144. LENT "tried to encourage her to stay on longer"; and it was "very important" to the practice to have her in place.

Additionally, Defendant maintained each doctor's "Employment" contract; issued all documents related to the entity's medical and dental plan; and profit sharing and 401(k) plan, in which only "employees" could join; and kept routine payroll records. It tracked their productivity; kept and filled their work calendars with patients via receptionist staff; tracked time off; and issued an annual form W-2.   By the preponderance of the evidence standard, Plaintiff argues, there can be only one finding here under the Equal Pay Act: Dr. Toole was what LENT said she was, an "employee."

Defendant relies on *Clackamas Gastroenterology Associates v. Wells*, 538 U.S. 440, 449-450 (2003), to argue Plaintiff is not an employee under the EPA.  In *Clackamas*, the United States Supreme Court concluded that the common-law touchstone of control determines whether a shareholder-physician is an employee under the ADA, and other anti-discrimination statutes.  The *Clackamas* court also

14

provided a non-exhaustive six-factor test to determine if an owner/shareholder is

an "employee" covered by antidiscrimination statutes:

> (1)     Whether the organization can hire or fire the individual or set
> the rules and regulations of the individual's work;
> (2)     Whether and, if so, to what extent the organization supervises
> the individual's work;
> (3)     Whether the individual reports to someone higher in the
> organization;
> (4)     Whether, and if so, to what extent the individual is able to
> influence the organization;
> (5)     Whether the parties intended that the individual be an
> employee, as expressed in written agreements or contracts; and
> (6)     Whether the individual shares in the profits, losses, and
> liabilities of the organization.

No one factor is dispositive. *Id.*

Federal courts have applied the *Clackamas* factors to Title VII and the Age

Discrimination in Employment Act (ADEA).  Neither the Sixth Circuit nor the

Supreme Court have extended the *Clackamas* decision to claims under the EPA.

*See Bowers v. The Ophthalmology Group LLP*, 648 F. App'x 573, 578 (6th Cir.

2016) (partner in ophthalmology practice was not an employee under Title VII);

*Bluestein v. C. Wisconsin Anesthesiology, S.C.*, 769 F.3d 944 (7th Cir. 2014)

(shareholder in anesthesiology practice was not an employee under Title VII, the

ADA, and the Rehabilitation Act); *Cronkhite v. Unity Physician Grp., P.C.*, No.

1:05-CV-01577-SEBJMS, 2007 WL 1035091 (S.D. Ind. Mar. 30, 2007).

(shareholder in emergency room physician group was not an employee under the

ADA or the ADEA).  Here, LENT fails to cite any controlling authority that

applies the *Clackamas* factors to an EPA claim, which involves a different statutory scheme.

Based on the foregoing, the Court concludes Plaintiff is an employee entitled to protection under the EPA.

## 2.  Title VII

The parties do not dispute that the *Clackamas* factors govern whether Plaintiff is an employee of LENT and protected by Title VII.

### a)  Right to Control, Hire and Fire

Plaintiff argues that LENT had the authority to fire her and exercised control over her by virtue of the parties' employment agreement.  LENT required Dr. Toole to abide by "all rules and regulations promulgated by the Company." Defendant makes much of the fact that Dr. Toole could only be terminated for cause, however, the cases relied on by LENT all involved termination provisions requiring a full shareholder vote for termination.  *See Cronkhite v. Unity Physician Group LLP*, No. 1:05-CV-01577-SEBJMS, 2007 WL 1035091 (S.D. Ind. Mar. 30, 2007)(supermajority of board vote needed for termination)*; Bowers v. The Ophthalmology Group LLP*, 648 F. App'x 573 (6th Cir. 2016)(a person cannot be ejected from a business without a full shareholder vote).

Moreover, LENT had the sole discretion to determine whether to pay Dr. Toole compensation during the 180-day notice period required if she were to

separate from LENT.  Additionally, LENT had complete control over whether a patient of LENT could be treated by Dr. Toole, evidenced by the Employment Agreement and LENT's decision to reassign her patients to other practitioners when she took a leave of absence to care for her dying mother.  LENT also required Dr. Toole to assign to LENT any rights to Dr. Toole's inventions made during her employment with LENT by virtue of the parties' signed Employment Agreement.  Based on the foregoing considerations, this factor favors a finding that Dr. Toole was an employee of LENT.

### b)  The parties' intent

As to whether the parties intended to create an employment relationship, "any express agreement between the parties as to their status [] is the best evidence of their intent."  *Janette v. Am. Fid. Group, Ltd.*, 298 F. App'x 467, 471 (6th Cir. 2008).  Here, the Employment Agreement, drafted by LENT's lawyers, together with Dr. Toole's benefits plans, all support the conclusion that the parties intended to create an employee relationship based on their express agreements. Additionally, both parties each expended tens of thousands of dollars in payroll taxes over the years based on the mutual understanding that Dr. Toole was an employee of LENT.  This factor also favors the conclusion that Dr. Toole was an employee of LENT.

### c)  Whether LENT supervised Dr. Toole

LENT argues that Dr. Toole's work was not supervised.  It asserts she never received any written evaluations.  However, LENT's Vice President testified that LENT "constantly" oversaw physicians.  Moreover, both Dr. Toole and LENT's principals testified that she and the other shareholders were required to work with management for setting their schedules, taking time off, and taking leaves of any material length.  Dr. Toole testified that when she sought to take leave to care for her terminally ill mother, Dr. Megler gave her a difficult time and asked if she really needed to take the time off.  When she returned from leave, LENT reassigned her patients to other doctors and removed her from the tumor board as punishment.  All of these facts support a finding that LENT supervised Plaintiff.

### d)  Whether Dr. Toole Had the Ability to Affect the Business

LENT argues that Dr. Toole could vote to affect LENT's affairs.  However, Dr. Toole has provided evidence that sometimes issues were raised during shareholder meetings, however they would be retracted and acted on with no vote when the management team assessed that Dr. Megler's view would not prevail. Moreover, Dr. Toole has testified that she was precluded from accessing all of LENT's financial data, particularly in regard to shareholder physician compensation.  The Executive Committee, in its sole discretion, determined what Dr. Toole could be privy to.  Dr. Megler also testified that even after LENT

determined it would be more transparent about financial data, it still chose not to provide Dr. Toole with the spreadsheets it used to set pay, nor the documents disclosing profits that were not fully distributed.  These facts favor a finding that Dr. Toole is an employee protected by Title VII.

**e)  Whether the Individual Shares in the Profits, Losses, and Liabilities of the Organization**

Here, the record reveals that Dr. Toole was functionally an employee on a salary with a bonus opportunity, not an owner entitled to distributions of profits or bound to pay losses. Her Employment Agreement set pay by referencing the shareholder agreement. Both Dr. Toole's final compensation (with bonus) and her base pay were entirely determined by the Company.  Dr. Toole had no right to any profits.  Whether she got any at all, LENT decided.

When Dr. Toole left LENT, because she was not entitled to any increase in its true value, the stockpile of such seven-figure "adjustments" that had been jointly earned by the staff during her tenure, but never distributed, were denied to her permanently.  As such, even though Dr. Toole was a shareholder, the reality was that she was not entitled to reap any upside in appreciation of the value of LENT.

Additionally, Dr. Toole had no obligation to cover LENT losses, which suggests she is not an owner, but a mere employee.  When the practice wanted to borrow money, LENT's lawyers understood the employee relationship was not a

partnership, so they drew up a new agreement called a "contribution agreement" to bind the employees to "share" liabilities. Dr. Toole refused to participate. Owners do not have a choice whether to invest as needed, and they do not need "contribution" agreements to bind them.

The above factors, based on LENT's own admissions and documents, demonstrate that Dr. Toole is an employee protected by Title VII.  Defendant's reliance on *Cronkhite v. Unity Physician Grp., P.C.*, No. 1:05-CV-01577-SEBJMS, 2007 WL 1035091 (S.D. Ind. Mar. 30, 2007) is unavailing.  *Cronkhite* is easily distinguishable from the facts present here.  In that case, the plaintiff had been directly, individually responsible for overall management of the practice. *Id.* at *4.  He had personally guaranteed the practice's debts to the tune of millions of dollars and admitted at his deposition that he was personally responsible for any losses. *Id.* at *5-6.  None of those facts are true here. That plaintiff got to vote on his salary model, which was tied to his percentage of ownership, unlike here.  *Id.* at *32-33.  *Cronkhite* does not involve facts like those presented here, in which the defense admitted that financial data was withheld, nor that what was disclosed upon request was erroneous.

For all of these reasons, the Court concludes that Dr. Toole was an employee protected by Title VII.

### 3.  Michigan's Civil Rights Act (ELCRA)

Dr. Toole also brings related state law claims for discrimination under the ELCRA. It forbids "employers" from discriminating, where the term "employer" is circularly defined as an entity that "has 1 or more employees…." MICH. COMP. LAWS § 37.2201(a).  Meanwhile the word "employee" is not defined. However, cases establish that the status of an employee must not be resolved based on common law control tests, as under Title VII. Rather, the "economic realities" test applies. *Ashker v. Ford Motor Co*, 245 Mich. App. 9, 627 N.W.2d 1 (Mich. Ct. App. 2001); Exh. C, *Michigan Occupational Safety & Health Admin. v. Yoder Fam. Farm*, 2022 WL 3692783, at *5 (Mich. Ct. App. Aug. 25, 2022) (in dicta, reviewing case law).  This test looks at: (1) control; (2) payment of wages; (3) hiring and firing and discipline; and (4) whether the plaintiff's duties are "an integral part of the employer's business toward the accomplishment of a common goal." *E.g, Chilingirian v. City of Fraser*, 194 Mich. App. 65, 69-70 (Mich. Ct. App. 1992). Also, an "analysis of the totality of the circumstances would be incomplete without reference to the contracting parties' own characterization of the employment relationship, as set forth in their written agreement." *Mantei v. Michigan Pub. Sch. Emps. Ret. Sys. & Michigan Pub. Sch. Emps. Ret. Bd.*, 256 Mich. App. 64, 85 (Mich. Ct. App. 2003).

The record facts that support a finding that Dr. Toole is an employee under the EPA and Title VII also provide support for the conclusion that she is an employee protected by the ELCRA.

For the foregoing reasons, the Court grants Plaintiff's Motion for Partial Summary Judgment.

### C. Defendant's Motion for Summary Judgment[2]

### 1.   Title VII and the ELCRA

### a.  Prima Facie Case

The parties agree that Dr. Toole's Title VII and ELCRA claims must be determined utilizing the *McDonnell Douglas* framework.  LENT maintains Dr. Toole cannot show she was treated differently than similarly situated white male shareholders, and therefore her claims fail because she cannot make out a prima facie case of discrimination.  Defendant further argues its use of an objective mathematical formula to set physician shareholder compensation is a legitimate, non-discriminatory reason for the pay differential.  Finally, Defendant asserts Dr. Toole cannot establish LENT's legitimate, non-discriminatory reason is pretext for discrimination.

---

[2] LENT first argues that Dr. Toole is not an employee under the EPA, Title VII, or the ELCRLA, however the Court has already concluded that Dr. Toole is an employee under the EPA, Title VII and the ELCRA.

To establish a prima facie case of sex discrimination under Title VII or sex and race discrimination under the ELCRA based on indirect evidence, plaintiff must show: "(1) that [s]he is a member of a protected class, (2) that [s]he was subject to an adverse employment decision, (3) that [s]he was qualified for the position, and (4) that [s]he was treated differently than a similarly situated individual outside the protected class." *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006). A defendant can rebut the plaintiff's prima facie case with a legitimate non-discriminatory reason for the action. *Jackson v. VHS Detroit Receiving Hosp., Inc.,* 814 F.3d 769, 776 (6th Cir. 2016). The burden then shifts back to plaintiff to show that the defendant's reason was merely a pretext for discrimination. *Id.*

Defendant maintains all shareholders, including Plaintiff, voted to have the Executive Committee calculate shareholder compensation. The Executive Committee used the same objective mathematical formula for determining each shareholder's compensation, percent of each shareholder's total Payments from insurance, Medicare/Medicaid and patients multiplied by LENT's profit. The formula was applied to Plaintiff in the same manner as all of her fellow shareholders. From that point, small adjustments were made to account for individual shareholder contributions to the medical practice. Defendant argues that in 2018, 2019 and 2020 Plaintiff had the largest upward adjustment among all

23

shareholders.    Plaintiff was not treated differently than her white-male colleagues.
In fact, Defendant asserts that Plaintiff admits that she has no evidence of
discrimination other than the fact she was paid different amounts than other
shareholders.

Here, Defendant ignores the record of evidence which leads to an inference
of discrimination.  Dr. Toole testified that she had the highest RVU rate yet was
consistently paid the lowest pay rate compared to her white male counterparts.  In
addition to the difference in pay, she testified that her contributions to LENT were
ignored, such as her exceptional work training the residents and her efforts at
performing consultations to bring in business for the practice, while her white male
counterparts' work was deemed "so much more important."  That she was not
perceived as equal to the other white male doctors is suggested by the minute notes
from shareholder meetings where the white male doctors are referenced as "Dr.
Megler" or "Dr. Rubin" and Dr. Toole was referred to as "Amanda" similar to the
non-physicians in attendance at the meetings.  She also testified about difference in
treatment about time off.  When she took leave to care for her dying mother, she
was penalized by having patients reassigned by LENT to her white male
counterparts, she was removed from the tumor board and paid less for taking a
leave of absence.  Meanwhile, her white male counterparts took weeks-long
vacations on a consistent basis without negative consequences.

Moreover, Defendant ignores the expert report prepared by Peter Glick, a Professor in the Social Sciences and Psychology at Lawrence University. Professor Glick is a highly respected author of professional papers and books on prejudice, stereotypes, and discrimination in the workplace.  *See* ECF No. 67-17. His report supports Dr. Toole's description of her experiences working for LENT. For instance, Professor Glick denotes that research establishes that in organizations dominated by white men, women and racial minority members tend to experience discrimination because people tend to favor their "ingroup."  *Id.* at PageID.2588. Many times, pretext permits and provides cover for discrimination which can be seen in differential treatment for the same behaviors or outcomes.  *Id.*  Generally, women and black men receive less organizational rewards (such as pay or promotion) compared with equally performing white men known as performance-reward bias, which is strong in more complex, high status, professional jobs, and "amply documented to occur in medicine."  *Id*.

Based on the foregoing, Dr. Toole has established her prima facie case of sex discrimination under Title VII and race and sex discrimination under the ELCRA.

### b) Legitimate, Non-Discriminatory Reason for the Difference in Pay and Pretext

Next, Defendant asserts that even if Plaintiff can establish her prima facie case, LENT had a legitimate, non-discriminatory reason for the difference in pay

between Dr. Toole and the white male shareholder physicians.  Defendant

maintains it used an objective mathematical calculation based on payments to the

Hospital and LENT to determine shareholder physician compensation.  Defendant

argues the minor adjustment to compensation was for legitimate, non-

discriminatory business reasons.  Specifically, to pay shareholder physicians who

took on a higher number of Medicaid patients with lower reimbursement rates.

Defendant further argues Dr. Toole cannot demonstrate LENT's reasons for

the pay differential was false.  LENT determined that using payments rather than

other methods such as RVUs was the best method for the practice.  With respect to

the minor adjustment after application of the objective formula, Plaintiff received

the largest increases from these adjustments. The Sixth Circuit has stated that a

reasonable jury could not find differences in pay raises were based on sex when the

plaintiff's raises equaled or exceeded the majority of the male comparators. *Foco*

*v. Freudenberg-NOK Gen. Partn.*, 549 Fed. Appx. 340, 347 (6th Cir. 2013).

Contrary to LENT's assertion, the issue of whether LENT's supposed

legitimate, non-discriminatory reason for the pay differential is mere pretext for

discrimination must go to the jury.  "An employer's changing rationale for making

an adverse employment decision can be evidence of pretext." *Thurman v. Yellow*

*Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996).  In this case, there is

evidence that LENT had changing answers when Dr. Toole inquired about how

pay was set, and Dr. Megler also informed her that her pay was decreased because she took a leave of absence to care for her dying mother.  Dr. Toole also testified that all of her work with the residents and performing consultations went unrecognized because her white male counterparts' work was viewed "as so much more important."

A jury may decide that LENT's explanation for its salary decision was not reasonable and its dissembling is a cover for discrimination.  Contrary to LENT's argument, the Sixth Circuit does not impose the business judgment rule in Title VII cases. *See White v. Baxter Healthcare Corp*., 533 F.3d 381, 393 n.6 (6th Cir. 2008).  The jury could therefore reject LENT's payment scheme as unreasonable because it ignored how much work people did (RVUs, training residents, performing consultations) and ignored how much it earned in income from the hospital (which was 100% of each RVU).  LENT negotiated in the PSA that it would always collect 100% from Ascension, insulating itself from the vagaries of collection. In fact, Ascension never intended to make money on the LENT deal because it would facilitate its Catholic mission of serving the poor.  Thus, Ascension controlled when and whether to write off patient debts even when LENT doctors did great work.  LENT was paid 100% for every RVU, yet Dr. Toole was always paid less despite performing the most RVUs year after year.

Defendant's reliance on *Foco v. Freudenberg-NOK Gen. Partn*., 549 F. App'x 340, 343 (6th Cir. 2013) is misplaced. In *Foco*, the court found the female account manager had received substantial raises during the course of her employment, whereas her male comparators had their salaries frozen, or in some cases reduced. *Id.* Conversely, in this case, Dr. Toole has never received any raise, much less a substantial one. In fact, Dr. Toole's salary decreased more in 2018 and 2020 than her male counterparts' salaries decreased.

Accordingly, Defendant is not entitled to judgment in its favor on Plaintiff's Title VII and ELCRA claims, and the issue of whether LENT's purported legitimate, non-discriminatory reason is mere pretext for discrimination must go to the jury.

## 2. Equal Pay Act

Defendant further argues that Plaintiff's EPA claim should be dismissed because she cannot show she performed equal work to the other shareholders.

Under the EPA, to establish a prima facie case of wage discrimination Plaintiff must show that LENT paid her at a rate less than the rate it paid male employees for equal work on jobs requiring equal skill, effort, and responsibility and under similar working conditions. 29 U.S.C. § 206(d)(1), *see Buntin v. Breathitt County Bd. of Educ*., 134 F.3d 796, 799 (6th Cir. 1998). "Whether the work of two employees is substantially equal "must be resolved by an overall

comparison of the work, not its individual segments." *Buntin*, 134 F.3d at 799.

Moreover, "not all differences in pay for equal work constitute violations of the

[EPA]." *Timmer v. Michigan Dept. of Com.*, 104 F.3d 833, 843 (6th Cir. 1997).

If Plaintiff presents sufficient evidence to prove a prima facie case, LENT is

absolved of liability as a matter of law if its distribution of profits to its

shareholders were made pursuant to (i) a seniority system; (ii) a merit system; (iii)

a system which measures earnings by quantity or quality of production; or (iv) a

differential based on any other factor other than sex. *Timmer*, 104 F.3d at 843.

Defendant maintains Plaintiff cannot show she performed equal work on

jobs requiring equal skill, effort, and responsibility and under similar working

conditions as her fellow shareholders.  Defendant asserts the evidence in this case

shows Plaintiff's duties and work performed were different than the other

shareholders. Each shareholder had their own unique practice. (Exhibit 7, Rubin

Tr. Pgs. 107, 140). Some shareholders focused on voice, some on hearing, some on

cosmetic surgery and others on general surgery. (Exhibit 7, Rubin Tr. Pgs. 36, 88-

89).  Plaintiff focused on thyroid surgeries.  Thyroid surgeries involve different

skills than other surgeries. The procedure and follow up care differs than other

procedures. The payment rate is different than other surgeries. Thus, Defendant

argues no reasonable juror could conclude that Plaintiff presented evidence that she

was compensated at a lesser rate than male shareholders who performed "equal work."

Here, Dr. Toole must raise a triable question whether the mens' jobs required "similar" skills, effort, and qualifications. *See generally Beck-Wilson v. Principi*, 441 F.3d 353, 363 (6th Cir. 2006). However, "Congress did not intend…to require that the jobs be identical." *E.E.O.C. v. City Council of City of Cleveland*, 875 F.2d 863 (6th Cir. 1989).

LENT's main argument is that Dr. Toole is different from her peers because she "was the only doctor performing thyroid surgeries for LENT." Mot. 20. This is not an accurate description of the record. *See* Shipway Dep. 48-49 (COO naming others who performed thyroid surgeries). LENT also misrepresents Dr. Toole's deposition. Specifically, Dr. Toole testified that she did thyroids *the most*–not that she is the only one who did them. *See* Toole Dep. 18-19, 86.

In any event, the exact workload of a plaintiff is not controlling; the overall duties are. *E.g., Galligan v. Detroit Free Press*, 436 F. Supp. 3d 980, 992 (E.D. Mich. 2020) (rejecting claim that news photographers were too dissimilar "because they performed different assignments[;]" differences in assignments were less important than similarities of serving as photojournalists); *see also Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480-481 (2d Cir. 2001) (professor could compare herself across college departments properly for EPA).

In this case, all LENT doctors were board certified and highly skilled ENT specialists.  Covering hospital calls further establishes the "similarity" of the qualifications and skill needed to work at LENT. About once per work week, each doctor covered the entire Ascension hospital's needs. That meant if a request for an ENT was made, the LENT doctor treated the need. That might be a thyroid case, allergy, a pediatric voice case – it did not matter. The doctors handled all types.

Such interchangeability was sufficient in *Beck-Wilson*. There, the jobs compared had many more differences – different titles (nurse versus physician assistant), job descriptions, qualifications (one required a masters, the other only an associates), and one job worked under supervision, while the other worked independently. *Beck-Wilson*, 441 F.3d at 356. Moreover, the 19 plaintiffs worked in entirely different disciplines (mental health, surgery, infectious disease), and they compared themselves to a group across disciplines. Those differences in entire disciplines were not controlling. The groups were "similar" enough to raise a triable question because one job type could fill in for the other – just as LENT doctors did. Interchangeability reflected similar skills and duties.
In the final analysis, "whether two positions are substantially equal for EPA purposes is a question of fact for the jury." *Id.* 363.

Defendant also asserts that, even if Plaintiff can establish a prima facie case under the EPA, her claim fails because any difference in pay resulted from a merit

system; a system which measures earnings by quantity or quality of production; or a differential based on any other factor other than sex. The system the Executive Committee used to calculate shareholder compensation was based on merit, quantity and quality of production and factors other than sex.  It is undisputed that the Executive Committee used an objective mathematical formula based on Payments from insurance, Medicare/Medicaid and patients to determine compensation.  LENT paid shareholders based on how much they worked and collected.  The minor adjustments were made to ensure a well-rounded practice; shareholders who saw a higher number of Medicaid and pediatric patients with lower reimbursement rates were adequately compensated.

Here, the Court concludes LENT's arguments in support of its affirmative defenses are unavailing.  "Unlike the burden-shifting framework applicable to other discrimination claims, the defendant bears the burden of proving" a legitimate basis for any pay disparities; the Plaintiff does not have to prove sexist intentions. *Siler v. First State Bank*, 2005 WL 1923179, at *2 (W.D. Tenn. July 28, 2005); *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 989 (6th Cir.1992). "Thus, it is …the employer who must establish the defense so clearly that no reasonable juror could find to the contrary." *Kahn v Dean & Fulkerson, P.C.*, 238 F.3d 421 (6th Cir. 2000); *see also Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 799-800 (6th Cir. 1998).

LENT now claims it set pay based on a bona fide "merit" or "quality" assessment system at Mot. 22. It cannot establish this so clearly that no reasonable juror could find to the contrary: Its own President testified pay was not based on quality or merit, because "I'm not aware of any really appropriate metric" to assess merit. Megler Dep. 149:14-15; *see also* Rubin Dep. 151 (measurement of merit does not exist). LENT's own admissions counter this affirmative defense.

LENT next claims that it paid objectively "based on how much [doctors] worked and collected," to be fair to doctors who did private work that was not assigned RVUs.  However, LENT made statements that it did pay on RVUs, not "Collections" or "Payments." Worse, LENT's own data suggests its pay rate was not just tied to "Collections or "Payments." *See* Plf.'s Appendix Charts 4-6 and 12-21, which suggest Dr. Toole topped this metric compared to various white male shareholder physicians – yet they were paid more.

Based on the foregoing considerations, LENT is not entitled to judgment in its favor on Dr. Toole's EPA claim.

### 3.  42 U.S.C. § 1981

Defendant argues Plaintiff fails to allege any facts indicating that decisions related to pay were motivated by or even related to her race.  Defendant maintains there is zero evidence that her race was the "but for" cause of her alleged race discrimination claims as required to sustain such a claim pursuant to § 1981. In

fact, at the time of her deposition, Plaintiff explicitly testified that she has no evidence that she was discriminated against based upon her race.

A prima facie case for discriminatory denial of employment benefits consists of four elements: (1) the plaintiff is a member of a protected class; (2) the defendant provided the benefit in question to members of its workforce; (3) plaintiff was eligible to receive the benefit; and (4) defendant's denial of the benefit gives rise to an inference of discrimination. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002). Further, a plaintiff must initially plead and ultimately prove that, but for race, she would not have suffered the loss of a legally protected right. *Comcast Corporation v. National Association of African American-Owned Media*, 140 S.Ct. 1009 (2020).

Dr. Toole counters that she can establish her § 1981 race discrimination claim by the burden-shifting approach set forth in *McDonnell Douglas* and circumstantial evidence. Plaintiff argues the difference in treatment (pay rates) leads to the inference of discrimination as a matter of law. She was consistently singled out for the lowest pay. Plaintiff also asserts that LENT was lying to her about how she was being paid.

For the same reasons discussed in the section addressing Plaintiff's Title VII claim, Plaintiff has come forward with sufficient evidence to submit her § 1981 race discrimination claim to the jury. As an initial matter, whether or not Plaintiff

knew which particular evidence supported her race discrimination claim at the time of her deposition is irrelevant.  Plaintiff is not a lawyer.  In any event, here again, Defendant ignores the entirety of the record before the Court. Specifically, the record evidence reveals that LENT paid Dr. Toole less than her white male counterparts even though she performed the highest number of RVUs, penalized Dr. Toole by removing her from the tumor board and reassigning her patients when she took a leave to care for her dying mother while her comparators took lavish vacations, and, finally, LENT ignored Dr. Toole's work with the residents and performing consultations.  Additionally, Dr. Toole's expert denotes that research has shown performance bias in organizations dominated by white men occurs in the physician work setting resulting in differences in pay for equal work for minority members.  In light of this evidence, the jury may reasonably conclude race was the "but for" factor for the pay differential particularly when Dr. Toole beat out her comparators in RVUs and even collections at times, yet always was compensated the least amount.

### D.  Defendant's Motion to Seal Plaintiff's Exhibits to Motion for Partial Summary Judgment

Defendant seeks to seal nine documents that Plaintiff relies on in her briefing in support of her request for partial summary judgment.

"[T]he right to inspect and copy judicial records is not absolute.  Every court has supervisory power over its own records and files, and access has been denied

where court files have become a vehicle for an improper purpose." *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 590 (1978). "[C]ourts have always been afforded the power to seal their records when interests of privacy outweigh the public's right to know." *In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 474 (6th Cir. 1983). Federal Rule of Civil Procedure 5.2 provides that the Court may order that a filing be made under seal without redaction. *See* Fed.R. Civ. P. 5.2(d). This Court's local court rules provide that the Court may grant a motion to seal upon a finding of a compelling reason why certain documents should be sealed. *See* E.D. Mich. LR. 5.3(a)(3)(C)(i).

However, the Sixth Circuit requires that the district courts impose the least restrictive conditions on the public's access to the Courts, and a movant seeking to impose any such restriction bears a heavy burden. *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299 (6th Cir. 2016). Any seal must overcome the "strong presumption in favor of openness" as to court records. *Id*. The Court must balance its power to seal documents with the "long-established legal tradition" of public access to court documents. *Brown & Williamson Tobacco Corp. v. Federal Trade Commission*, 710 F.2d 1165, 1177 (6th Cir. 1983).

### 1. Non-party Shareholder Compensation Documents

LENT argues the non-party shareholder compensation documents should remain sealed because the shareholder physicians possess a justifiable privacy

interest in their names and financial records not being disclosed to the public. The confidential documents include dollar amount of profit allocation, bonus compensation, total fiscal compensation, and 401k and profit-sharing retirement contributions for each shareholder of LENT.

Plaintiff counters that the non-party shareholders' compensation information can be protected by omitting their names and replacing them with Doctor 1, Doctor 2 etc., with redaction on exhibits setting forth pay.

Based on the foregoing considerations, Defendant has established compelling reasons for sealing the documents at issue. Accordingly, the Court grants this aspect of Defendant's Motion to Seal.

### 2.  LENT's Financial Documents

Next, LENT asserts its financial information documents should remain sealed. Courts within the Sixth Circuit have recognized that financial statements may be filed under seal. *See Vetel Diagnostics v. Bossardet*, No.11-cv-14575, Dkt. No. 26.  LENT maintains it will be significantly harmed if the confidential information is publicly disclosed. If disclosed, LENT's ability to negotiate with hospitals will be impacted, and competitors will have the ability to use the information to LENT's detriment.

As to LENT's financial documents, Defendant has likewise demonstrated a compelling reason for sealing its financial documents. Therefore, LENT's financial documents shall remain sealed.

### 3.  Hospital Agreements

LENT further seeks to keep the 2012 and 2016 agreement between it and the hospital confidential. These contracts contain exclusivity clauses, practice requirements, compensation for accounts receivable, and payment for expenses, and LENT compensation. LENT argues its competitive standing within the industry will be significantly harmed if these contractual terms are publicly disclosed.

The Court will also grant Defendant's request to keep the hospital agreements under seal. Defendant has advanced compelling reasons to warrant sealing the hospital agreements. Accordingly, Defendant's Motion to Seal is granted.

### E.  Defendant's Motion to Seal Exhibits to Defendant's Reply

Defendant also seeks to keep under seal certain exhibits it filed in support of its reply briefing on its Motion for Summary Judgment. Specifically, LENT seeks an order to seal the following: (1) Exhibit 2, LENT's Payroll records, (2) Exhibit 3, LENT's Fiscal Year Compensation, and (3) Exhibit 6, LENT's records on Partner Meetings and Finances. LENT raises the same arguments in support of its second

Motion to Seal as it did in its first Motion to Seal.  Specifically, the privacy interests of the non-party shareholder physicians outweighs the public's interest in access to the Courts.  Additionally, the financial information set forth in LENT's exhibits, if filed on the public docket, will cause harm to LENT by allowing competitors to undercut LENT, and it could harm LENT during its negotiation with the hospital.

Plaintiff responds to Defendant's second Motion to Seal as she did to the Defendant's first Motion to Seal.  She argues that at the very least the physician shareholders' names can be changed. She maintains Defendant has not shown that the sealing of entire documents is necessary.

Based on the foregoing considerations, Defendant has established compelling reasons for sealing Exhibit 2, Exhibit 3 and Exhibit 6 in its reply brief. Defendant's second Motion to Seal is also granted.

### F.  Joint Motion to Strike

Finally, Plaintiff inadvertently publicly filed exhibits I and P through S under the belief the exhibits were not subject to Defendant's first Motion to Seal. Therefore, the parties jointly move to strike these documents from the public record and permit Plaintiff to refile the remaining exhibits and pages therein that are not subject to the Defendant's Motion to Seal.  *See* ECF No. 62, PageID.2325-2328.  Accordingly, the Court grants the parties' Joint Motion to Strike.

## IV.   CONCLUSION

Plaintiff's Motion for Partial Summary Judgment [#55] is GRANTED.

Defendant's Motion for Summary Judgment [#56] is DENIED.

Defendant's Motion to Seal Confidential Documents [#60] is GRANTED.

Defendant's Motion to Seal Reply Exhibits [#74] is GRANTED.

The parties' Joint Motion to Strike Exhibit [#64] is GRANTED. Pages found

at PageID.2325-2328, Dkt. No. 62 are STRICKEN from the record.

The following dates shall govern in this matter:

| AMENDED SCHEDULING ORDER | |
|---|---|
| YOU WILL RECEIVE NO FURTHER NOTICE OF THESE DATES | |
| Optional Facilitation: | No later than July 31, 2023 |
| Settlement Conference with Magistrate Judge David R. Grand: | August of 2023 |
| Motions *in Limine* due: | September 1, 2023 |
| Final Pretrial Order due: | September 1, 2023 |
| Final Pretrial Conference: | September 25, 2023 at 2:00 p.m. |
| Trial Date: | October 10, 2023 at 9:00 a.m. |

SO ORDERED.

Dated:  June 2, 2023

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge